I call the next case on the docket, which is 517-0316 Mormat Electrical & Construction Serv. v. Hunter Construction Serv. Oh, I'm sorry. Sorry. You're the tall one. We don't allow that. You may use a cup, but we're not going to let you drink a bottle of water like that. I was told the Irish mean of the name is little people, so I have a contradiction in many ways. Yes, you are. Yes, you are. But welcome. Thank you. Maybe, you know, Abe Lincoln actually, don't charge him for this time. Abe Lincoln actually argued a case here, you know. I don't know if he was as tall as you. I think he was 6'7", is what I understand. Oh, you beat him. Okay. All right. Go ahead. May it please the Court, this is Dan White for Defendant Appellant Hunter Construction Services. This is on appeal from the Judgment of the Circuit Court of Judge Cole v. Torney Judicial Circuit. Effectively, this case involves a contract dispute between a general contractor and a subcontractor involving the construction of a Buffalo model wings in North Dakota. And the main issues for appeal all relate to effectively Judge Cole was awarded a $58,000 in favor of plaintiff Norma Construction Company. We've alleged three separate errors that all result in that same award. Specifically, Judge Cole failed to properly interpret the oral contract between Norma Construction and Hunter Construction. He also failed to acknowledge the effect of a lease that was entered in November of 2014. And then finally, failed to acknowledge the partial performance by Norma Construction and provide the appropriate offsets and credits for work that was required to be performed by alternate electricians to complete the work. And what is not an issue in this case is that there was a oral contract between Norma and Hunter to perform and it's the scope of the contract is all electrical work for the Buffalo model wings. Because this was going to be in out-of-state of Illinois, the codes in that state require that a licensed electrician be present to pull the permit and to supervise the work. So at the very outset, it was acknowledged by all parties that Norma Construction was not licensed in out-of-state and could not pull the permit, could not perform all the work. Despite that, the contract was to perform all work. Everyone agrees that the scope of this work required probably four to five electricians for a period of three to four months. That was also not disputed in any way. When the work began, the facts were very clear that Norma only sent two electricians to perform the work and the oral contract, which is an integrity, and Brandon Dimmick's name is brought up, was present on site and performed significant work. There were ten invoices, in fact, that were submitted by integrity and Brandon Dimmick starting in August when the work began and finishing in December 2014 when the work was completed for two electricians present the entire time and comprising about $72,000 of work. The issue is whether this time and this work performed by integrity and performed by Brandon Dimmick was chargeable to the scope of work as it relates to the subcontract with Norma Construction. So the scope of work, as I understood it, was $135,000. Yes, ma'am. And the issue now is who's going to pay for it, the North Dakota people? Correct. But there was some overtime issues. I wasn't sure how that came in. Well, frankly, Your Honor, I was not trial counsel, but reviewing the record, I don't see whether any invoices that were actually part of the record that outlined any overtime by any party. So that's one of the issues I'll address later as it relates to what their potential damages are. There are actually no invoices except for one that was submitted by Norma that's in the record, and that was the final invoice for approximately $58,000. Yeah, you know, I saw $58,400 is what the sub asked for, and the judge gave $59,400. Well, I think that there is. I think he asked for $58,000, which is the balance of the subcontract. Assuming that the scope of work did not include the sub. Correct. So there's a $58,000 balance, and then there was an agreed-upon additional work of $1,400 that I think all parties stipulated. And that's where you get the change from $58,000 to $59,400 as part of the judgment. And the $1,400 is not part of the issues on appeal. So that's no issue. Correct. So we're really talking about the $58,000. Yes, Your Honor. Thank you. No problem. And the court acknowledges there was no statement. Obviously, this is not right. There was no specific statements or e-mails, outside information, that acknowledge or state that this is not going to be included in the subcontract, but there are countless communications. And mainly this is seen as Exhibit K, which is part of the record, which is a stream of text messages between Mr. Hunter and Mr. Carney, who is the president of Wormack Instruction. So, you know, I see the reference to the e-mails, and so I wonder about this oral contract. When do we have an oral contract, and when do we have parole evidence, versus when do we have a written contract? And I think that's part of the issue, is that this is an ongoing discussion as this develops. And to try and state that, you know, the contractor's terms were determined right at the inception and right the first time of communication, I think is disingenuous because of these ongoing discussions. You know, Mr. Carney and Mr. Wormack. But if that's true, what you just said, if that's true, then there isn't a meeting of the minds on the oral contract. Or was it amended as it went along? Well, and I think it can be. Well, and I think it can be. I think that's where the release comes into play in the November 21st lien waiver slash release because, you know, there's communications between Mr. Carney and Mr. Wormack about, you know, Mr. Carney, two of his workers show up, and there's another person there. And he asks why he's there. There's communications about this $25,000 that was put back into the budget. And it's clear that Mr. Hunter, Mr. Hunter Construction, states, well, this is going to help us out because if I cover Brandon Dimmock's time in integrity with that $25,000, it's going to put more money in the $135,000 back to you. And he says, it will make this job profitable for you. Mr. Carney responds back, that's great. I want it to be profitable for all of us. There are some breakdowns in the giant. Doesn't that make it clear, though, that Wormack is responsible for the North Dakota sums? Isn't that what that's saying? I don't think so. I think what it's saying is that, you know, the $135,000 is going to cover all electrical. And if the owner is going to put $25,000 more in there to help for all the electrical, and it's going to pay off Brandon Dimmock in integrity, this is now going to put more money in that $135,000 pool back to Chris Carney and Wormack Construction. That's what that's saying to me. I thought that was confusing. I mean, I don't understand what he's saying there. Well, unfortunately, I think Mr. Chairman. $25,000 plus $135,000? Because he was always going to put in $135,000. And the text message, which I think is, and I can look at the years, October 3rd text message states, the owner will place an additional $25,000 into the budget. And I think if you read the text specifically, it states, this will almost take care of Brandon's time completely and give you, Wormack, a profitable job. That's what I say. It seems like that makes Wormack responsible for the subs, the Dakota subs. Absolutely. Absolutely. Because he responds specifically saying, thank you, I want this to be profitable for both of us. The text messages go on, but there's an opportunity for the North Dakota license holder to leave. They might find someone else. And there's discussion about what the rates would be for alternative license holders. There's acknowledgment by Mr. Dinnick or by Mr. Carney. Yes, that's going to help the bottom line. But if the rates that are being charged by the North Dakota subs and North Dakota electricians were irrelevant to the $135,000, as Wormack Construction would have me believe, why does he care? Why doesn't the construction discuss it with him? And why are there acknowledgments that cheaper rates are going to be better for me? I think one of the most telling things with respect to the text messages is, Chris Carney at one point offers to have an additional employee. His name is Mr. Collins, arrive and go up to the project. And at that time he says, do I need to have Collins come up there? This will save time. And unfortunately there's a word used to refer to Mr. Dinnick, who is the local license holder. But he basically says, if I send my own employee, Mr. Collins up there, it will save overtime for Mr. Dinnick and Integrity. So Mr. Wormack, Mr. Carney is saying, I will put money out of my own pocket, send my own employee, pay his wages, put him up in North Dakota, and it's cheaper than paying Brandon, Dinnick, and Integrity overtime. Why? It's because the overtime is charged back to me. If that wasn't the case, I mean, if this wasn't charged back to Wormack, he would be just as happy providing zero electricians, one electrician, and is sitting back letting someone else do the work and he collects the whole 135. Judge Corker, in his argument, or in his order, states, this would improperly shift the risk of contract law. I think the alternative is true. If we allow Wormack construction to not provide enough people to perform the scope of work and let someone else do the work, that improperly shifts the risk. And that goes into what I believe is the issues with the partial performance. Again, as Justice Chapman said, you know, I'm not sure where this contract is. I have a real dilemma interpreting the contract because of these texts, emails, or whatever they are, vis-a-vis the original oral contract. You've got to build a Buffalo Wild Wings, you're the electrical service, 135K, but we've got to have a North Dakota because you're not licensed. We get that. But then you have all these emails. To have a performance, you have to have a contract, right? Even to talk about partial performance? Correct. What did Judge Corker find were the terms of this contract? Judge Corker, in his order, basically said it is 135 to perform all the work. I didn't understand. I couldn't tell what he meant. Except from his award, you can deduce that. I wish I had been to understand that, but that's where I believe that Judge Corker's award is somewhat arbitrary. You know, he fails to analyze the other things and just says effectively, I believe that Dimick and the North Dakota contract was outside of the scope and it was all on Hunter to pay for that. But what we have in the evidence from both parties would suggest other things. And it would suggest, as you say, that this relationship is ongoing and it's changing from day to day and month to month. And is there really an obligation going forward? And I think if you see, there is the November release, lien waiver and release. And let's talk about that. And there were several different documents that were used to release liens. Some were titled lien waivers in reference to the mechanics of the language that I think we're all familiar with. Then the next one, and the one that's at issue, was on November 21st, I believe. Let me pull it up. I'm sorry, November 19th of 2014. 17th, I think. Which one are you talking to, about November or October? This is sub E-49. E-49. November 19th, 2014. The Unconditional Lien Waiver and Release. And it's signed by Chris Connie, who is MoMAT's president. And it states that the project acknowledges receipt of payment of $10,000 and a consideration of such payment hereby waives or releases any and all rights to claim, both now and in the future, mechanics lien or any other lien or rights or claims. And then it states, against the project owner, surrogate lender, if any, and any other parties who have an interest in the project, any other individual or entity for such labor, materials, skills, equipment, tools, supplies, et cetera, up to the 19th of November, with exception of unpaid retention of zero. At that time, if you look at the invoices, and if you look at Exhibit D, which was, let me get you the references of the record, I apologize, sub E-17. And this is the list of invoices supplied by Hunter Construction. At that date of November 19th, 2014, there were four invoices submitted by MoMAT for a total of $60,000. Yet on the 19th of November, 2014, at the time of execution of this document, at the time of the payment of the $10,000, Hunter had paid $77,000. So this is not a new laborer paying for what you've already done. This is, I'm paying you $70,000 for invoices you've sent me to 60 at this point. And there is a promise made that upon receipt of this, you acknowledge your pay-to-date and you wait for future claims or further claims for a work performed prior to this date. I'd suggest that as part of what, of course, acknowledging that this contract and this relationship is ongoing, this suggests you have paid up-to-date to the extent to perform work after this submitted invoice, and we'll discuss where it is in relation to this overall scope of work. So I think effectively what this does is this releases any claim for work prior to November 19th, 2014. But what we don't see in the record or in testimony is any itemization of cost, labor, or anything that MoMAT would have incurred in trying to charge back to Hunter after that date. We just have one invoice that's dated, I believe, in December. It just says $58,000 for a balance of the 135. That's all we have. And then, regardless, I think if you want to look at the 135, and that was the intention at the time and that contract was still in place at the end, I think we have to look at the partial performance issue. And the courts are unwilling to remove an obligation to pay if there's partial performance. That being said, they were clear, and I cite the Royal case, that a contracting party may receive credits or debits for any work or damages they've incurred to ensure they get full performance. But that's kind of what we had here from the start. We had partial performance moving forward when MoMAT only provided up to two, maybe three electricians at a time, and Mr. Dimmick and Integrity did the same and supplemented this work the entire time through. The evidence is clear. There were 10 invoices, $70,000 of which was paid to Integrity, and in an appellate zone brief on page 21, they acknowledge, yes, we are entitled to a credit for that. Now, they claim there should be also credit for some additions that were done, but that's outside the scope of the contract. They acknowledge that. Judge Cooper acknowledged that. And the issue on appeal is just that initial contract. Furthermore, there was no evidence that was supported in the record of any means as to what additions that were performed. In fact, Denise Carney, who was MoMAT's administrative building operator on R110, acknowledged that she really didn't have any records to identify any additions of any kind. I'm sorry if I was wrong a little bit. Well, frankly, Your Honor, I think that I do want to address briefly the issue of the standard review. I identified that I believe that a contract should be, the interpretation of a contract should be de novo in my brief, and I know there's been some authority that was provided by appellate in their brief that it should be a manifest way to the evidence for this new contract. Those same cases you discussed, when the facts were undisputed, that it still can be de novo, I would suggest that because there was clear, well, you know what, honestly, I don't even care. I think that in a manifest way, this ruling was arbitrary. It was not based on evidence. Judge Cooper cites a few text messages in general, but if you actually look at those text messages, if you look at what he's citing in the record, I don't see how he can possibly make the ruling that he does and completely not acknowledge the work that Brandon Dimmick and Integrity did that furthered this project and ensured that it got completed. So whether it's in the initial contract interpretation or it's part of a partial performance and there's the damages that under construction incurred, I think they are absolutely chargeable, and I think the evidence not only would provide an inference for a finder, in fact, to make the determination, but I think they absolutely require them to make such a finding. The fact that they've acknowledged that there should have been a deduct or a credit for that work just shows that even Moremat itself acknowledges that the court performed error by doing so. Now, they suggest there should have been an addition for the work, but that's not really what's at issue before this Court. So I would suggest that the Court conclude specific errors in their order of June 25, 2017. This matter should be reversed and that the judgment of $58,000 should be reversed. Thank you very much, Mr. Hoffman. Is there a response? Good morning. May it please the Court? My name is Roger Punka. I'm the counsel for Moremat. In this particular case, there were two contradictory stories. My guy is up working in North Dakota on this project. He's been paid $77,000 and he is bleeding out and going broke. He asked the general contractor, pay me. The general contractor says, don't worry, more money is coming, keep going, finish the job. Well, when the job is done, the general contractor says, no money for you, because all these other charges are billed against your agreement. And my client says, no, that was never our deal. That was always the deal that you were paying for him. And integrity says, no, no, it was always the deal that you were paying for them. Two completely different stories. So these parties decide, okay, let's all go under oath and go tell the court our story. And we'll see which one the judge believes and which one he doesn't. So what you're saying is there was no contract. There was a contract. There was? Yes. There was an oral agreement. How can there be a contract if there's no meeting of the minds? There was a meeting of the minds. It was only after the fact that the general contractor made up this story to try to get out of paying. That's what happened. And it wasn't believable and it wasn't true and it wasn't credible. So what you're saying is there was an oral contract that the court could find and that this turned on the credibility of the witnesses as to the terms. Without a doubt, Your Honor, and the record is very clear. Everyone admits to it. Do you agree that the order doesn't give credit for payment? Credit for payment? Mr. Lido was just arguing that Mormat acknowledges that there should have been a credit. Did you hear his argument on that? I did. I did not interpret that to be his argument. I think, as I understand his argument, both in his brief and orally today, it's that credit should have been given for work that others did within our base contract. He's not talking about payments. He's talking about value, a value proposition. Meaning, he's saying, well, you didn't do $135,000 worth of the base work, so some deduction should occur. And obviously the record is full of all the extra work that we did too. We admitted that these guys did part of our base work. That's what happened. We also did all of this extra work. And all of that evidence was clearly elicited before the court. And all the court had to do, if he believed Denise Carney, if he believed Chris Carney, all of that evidence was before them, that those were awash, that our labor hours were correct. The judge specifically addresses that integrity did part of the scope, but there were also the extras, and nobody did that at that moment. There was no meeting of the minds that there would be this addition and subtraction. And so the court specifically addressed that in his ruling. The trial judge went right over that. So if they continue to talk, this is all this is. All they're asking you to do is pay attention to the evidence that favors our case and ignore the evidence that doesn't. Except that's not what happened. All of the evidence was presented. And the entire issue about the values was completely tried, fair and fully. There is no air of law below. This is just a straight way to the evidence appeal. And if you really consider the cold record, I don't want to repeat my brief, but, I mean, Mr. Young was not credible. The totality of the record demonstrates his lack of credibility. How do you get around this release? Well, the lien waiver lacks consideration. It's a trick. This happens in this industry all the time. Well, there was also an unconditional lien waiver of October 17, 2014. So the subcontract is an industry practice, and this is in part of the record. You have to get these lien waivers to get paid. Okay, so let's stick with the record. It is in the record. This November 19th release is, I mean, Judge Coker says that somehow the text messages allowed him to get around it.  But as I think his wife testified to, she was surprised that he signed this. Correct, because he doesn't normally do that. His wife normally does. Right, she handles the bookkeeping, so to speak. And so that was basically a final lien waiver as presented as an interim lien waiver. And then the evidence after the fact is that we're still working and that he's telling us we're going to get paid. And he admits at trial that is not the reason why he says we shouldn't get paid. He admits this. He says, no, that's not why. The reason you shouldn't get paid is because you have to pay for integrity costs. That means Hunter admits this directly at trial. That is the sole reason we're having this trial. He is not defending on the lien waivers. Those are the lawyer's arguments, but Hunter Young admits during trial that that isn't why we're here. So the court correctly found that those were not effective releases, but the parties clearly contemplated further payment and further work after the fact. And to the extent that anybody thought otherwise, that was a mistake. And I actually completely agree with that ruling. No one seriously argued that except at trial. And I, the witness, admitted that he did not do that. So what I want to talk about first, and there were some questions that were raised just quickly, was about this overtime. You know, I don't know if the court probably knows this, but you know the trial court, the clerk lost the exhibits. And Dan wasn't, Mr. Lytle, my colleague, was not there at trial. I was. And so we had to recreate the exhibits. And as the appellant, he was trying to recreate the record on appeal. He got pretty close, but he did miss a couple.  He couldn't have known that. But also another exhibit is this overtime invoice. And right on the record at the end of the testimony of Chris Carney, when we're going over damages, we submit that invoice and we submit that, I think it was about $10,500. And that is in the record. What does that have to do with the judgment today? Well, they were because, it has to do with the judgment because he continues to talk about the credit that his client should have received for the work done on the base contract. But he never wants to talk about the other side of the fence, which was the benefit that his client received for the work that was extra, which was the overtime, the trenching, the following. Where in the court's order does it discuss that? Discuss what? Where does Judge Colker talk about all of that? Why is that important? Why are you arguing it now? Because the judge is a lawyer. The reason that's important is because the judge is considering both sides of the fence. And the appellant argues that you just consider one side right now. I understand, but I didn't see it in his order, the records. Did you exhibit any impact of that with credibility or otherwise? This is the legal record, page C56 at the bottom. It's page 406 of his order. And it says integrity and other electricians provided some portion of the original scope of Wal-Mart's electrical services, and Wal-Mart provided additional service to 100 beyond its original scope, including the carpenter services while the job was shut down. All these undertakings were done without any agreement to be compensated for the same. And then he goes to you on his order? This is page four of six of his order. And then on the next page, he talks about the requested amounts. And what he does is he says, I'm not going to give you, Wal-Mart, this additional money you're asking for because that would be inconsistent. That would be fundamentally unfair. If Hunter is bound to the deal, then so are you. And so you can't have these extras. That is implicit in his ruling right there. He rejects the request addition amount. See, it says, Wal-Mart requests additional amounts. And he rejects the contention. So that is essentially what he did. As we were saying, hey, we get these extra monies, the judge said, no, no, you don't. You're not getting the extras and you're not getting the deducts. And that's exactly what the two of you planned. And honestly, it's fair and just. This is exactly what happened. We told the truth. My client was fairly compensated by the court's judgment. We don't talk about fairness and justice in the law enough. And being in this historic courthouse, we should argue these things. This is a fair and just outcome. All they're doing is asking you to take a second bite at the apple and second guess the judge. But he was there to judge the credibility. And the law is crystal clear that when you have two contradictory stories, which is exactly what happened in this case, great deference must be given. Because he's there to give the weight and how much preponderance should be given to the evidence. And Mr. Young was not credible. He was not credible because he lied. Because he didn't want that to stop. So I submit to the court that there is no error of law. This is a pure manifest way of the evidence appeal. And I submit to the court that there is ample evidence to support the court's judgment. And it should be affirmed in all respects. If you have any further questions. Thank you, Mr. Pagan. Mr. Loyola? Yes. I really just want to address two items. And Mr. Young from Hunter Construction did state, I don't believe in his mind their release had any effect. It's because he believed the offset of $72,000 on top of the $77,000 already paid to Moorman, Moorman took care of any monies that were owed. So in his mind, in effect, their release made no difference. That being said, if the court believes that that's not the case, the argument about the release was made at court. It was argued by attorneys. And it's an argument that he had. It was noted. And I think the court failed to acknowledge that to the extent that the court does not believe that the offset of $72,000, which was acknowledged by Moorman, that was appropriate. So the release then is the alternative argument number two. And any award over and above that date of November 19th, 2014, should be limited only to that work thereafter. Okay. Thank you. Thank you both. This matter will be taken under advisement. And we'll just continue. We'll be issuing reports. Thank you both gentlemen.